IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NVIDIA CORP. AND NVIDIA U.S. INVESTMENT COMP., <br><br>    Petitioners and Real Parties in Interest, <br>    v. <br><br>U.S. BANKRUPTCY COURT FOR THE NORTHEN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION, <br><br>    Respondent, <br><br>and <br><br>WILLIAM A. BRAND, JR., Trustee, <br><br>    Real Party in Interest. <br>_____/ | NO. C 06-MC-80195 JW <br><br>**ORDER GRANTING NVIDIA'S PETITION FOR WRIT OF MANDAMUS REGARDING ORDER COMPELLING PRODUCTION OR PRIVILEGED DOCUMENTS (CRIME FRAUD); REMANDING TO BANKRUPTCY COURT FOR A DETERMINATION CONSISTENT WITH THIS ORDER** |

**I. INTRODUCTION**

nVidia Corporation and nVidia U.S. Investment Company ("nVidia") petition the Court for a writ of mandamus to the U.S. Bankruptcy Court for the Northern District of California ("Bankruptcy Court"). nVidia contends that the Bankruptcy Court's June 7, 2006 Order re: Motion to Compel Production of Documents would compel it to produce documents protected by the attorney-client privilege. The Court conducted a hearing on November 15, 2006. Based on the papers submitted to date and the oral arguments of counsel, the Court GRANTS nVidia's Petition for Writ of Mandamus.

## II.  BACKGROUND

**A.  Factual History**

On December 15, 2000, nVidia and 3dfx entered into an Asset Purchase Agreement ("APA"), pursuant to which nVidia was to pay $70 million in cash in exchange for 3dfx assets. (Declaration of Kim Y. Arnone in Support of Trustee's Motion to Compel Production of Documents (Crime Fraud) ¶ 3, Ex. 1, hereafter, "Decl. Arnone."[1])  If 3dfx dissolved in accordance with a formal Plan of Dissolution satisfactory to nVidia, nVidia was to pay 3dfx one million shares of nVidia stock.  (Order re: Motion to Compel Production of Documents (Crime Fraud) at 2, hereafter, "Crime-Fraud Order").  3dfx did not complete an orderly dissolution.  Id.

nVidia and 3dfx entered into an Escrow Agreement on April 18, 2001, shortly after the APA of December 15, 2000.  (Decl. Arnone, Ex. 27 at 1.)  A summary of the Trustee's evidence regarding the Escrow Agreement that was presented to the Bankruptcy Court under seal is provided below. (Decl. Arnone, Ex. D.)

Five 3dfx creditors obtained writs of attachment following the APA's signing:

| Creditor | Amount Due Under Writ (U.S. Dollars) |
|---|---:|
| HL Yoh | 378,875.39 |
| Network Appliance | 321,172.42 |
| CIT | 701,113.98 |
| Hyundai | 1,220,000.00 |
| Star Temps | 10,154.00 |
| **Total** | **2,631,315.79** |

(Decl. Arnone, Ex. 27 at 1, Ex. A.)  nVidia paid $2.6 million into an Escrow Account for 3dfx's use in settling the writs of attachment.  (Decl. Arnone, Ex. 27 at 2.)  3dfx agreed to use the Escrow Fund

---

[1] The Declaration of Kim Y. Arnone is Exhibit D to the Appendix of Excerpts of Record in Opposition to nVidia's Motion for Leave to Appeal Order Partially Granting Trustee's Motion to Compel Production of Documents, and to nVidia's Petition for Writ of Mandamus (hereafter, "Trustee's Appendix.")

solely to pay the creditors with writs of attachment unless nVidia provided written consent to payment of other creditors. Id. nVidia and 3dfx agreed to keep the existence of the Escrow Account secret. As 3dfx's CFO, Richard Heddleson, testified:

> Well, the discussions were that we were engaged in negotiations with the various creditors to settle the debt with the creditors. And these creditors began litigation against 3dfx. And so had they known that monies had been set aside for them to be paid in full, it would have reduced our ability to negotiate settlement with them, and they simply could have waited until they got paid in full in preference to the balance of the creditors who had not initiated litigation against the company.

(Decl. Arnone, Ex. 3, at 405:10-21.) Similarly, nVidia's CFO, Christine Hoberg, responded "Yes," when asked, "So you individually were involved to enough of an extent to know that nVidia was trying to avoid disclosing to creditors the existence of the escrow account, correct?" (Decl. Arnone, Ex. 2, at 939:15-19.)

nVidia's counsel was also aware of the agreement to keep the existence of the Escrow Account secret. On April 24, 2001, Stephen Pettigrew, an nVidia in-house attorney, forwarded an email to Richard Heddleson, 3dfx's CFO, concerning the Escrow Account. The forwarded email was written to Pettigrew and Hoberg by Tharan Gregory Lanier of Cooley Godward, LLP, nVidia's outside counsel. Lanier stated in pertinent part:

> It is also plain that nVIDIA will likely be dragged into court (probably along with 3dfx) to explain its reasons for not making payment to the sheriff. Absent settlements with 3dfx, I expect ex parte enforcement proceedings to commence before the end of the week. I recognize that nVIDIA is trying to assist 3dfx's negotiations with these creditors by not revealing the existence of the escrow. I plan to buy a bit more time by responding to creditors in writing late today, simply explaining that the levied party, nVIDIA Corporation, did not make any payment to 3dfx on April 19, nor should creditors have thought it would, based on the publicly disclosed documents concerning the transaction.
>
> I do think it will appear a bit odd to the court(s) if we reveal the existence of the escrow for the first time in court papers (or orally) in response to enforcement proceedings. Nonetheless, given previous instructions, we won't mention the escrow until then or until you allow us to do so.

(Appendix of Excerpts of Record in Support of Petition for Writ of Mandamus Regarding Order Compelling Production of Privileged Documents, Ex. A at 18, hereafter, "nVidia's Appendix.")

3

Subsequently, nVidia and 3dfx continued to discuss whether to reveal the existence of the escrow account to creditors. In an April 26, 2001 e-mail, Hoberg wrote to Heddleson,

> [W]e are under increasing pressure and legal risk by not disclosing the existence of the escrow acct to the 2 remeaining [sic] problem vendors. I know you wanted us to keep silent about this to help your negotiation position and we have tried to do that for as long as possible. It is no longer possible for us to do so and they are threatening legal action against us. Hopefully you understand this is something I need to avoid.
>
> We will try to continue to hold off, but I have instructed our attorneys to tell CIT and Yoh of the existence of the escrow acct if it is the only way to keep us out of expensive legal trouble. That course may happen as soon as today.

(Decl. Arnone, Ex. 36.) Heddleson responded, "Please be sure that [outside counsel] knows that we object to your taking this step. It interferes with our ability to negotiate with our creditors. nVidia does not seem to be at any risk in this matter as far as I can see. We are fully at risk and deserve the opportunity to negotiate and defend ourselves as we see fit." Id. Stephen Pettigrew, an nVidia in-house attorney, responded:

> Further to our telephone call at this morning, we are advised by Greg at Cooley (outside counsel) that its [sic] time we revealed to CIT the existence of the escrow created at the closing, so as to insure that Nvidia properly complies with the garnishments. By this email, I ask Greg Lanier to circulate an email with his thoughts on this issue, so we can further discuss this afternoon.

Id. On May 9, 2001, Pettigrew informed Heddleson,"Nvidia has not disclosed the escrow agreement to the garnishors, but will have to disclose to Yoh within about 5 days." (Decl. Arnone, Ex. 37.) Heddleson inquired, "Has anything been disclosed to our creditors? In the future, will we be sent copies of whatever is sent to them?" Id. Pettigrew responded, "Nothing has been disclosed to creditors and we have no intention of disclosing anything to creditors, except with Yoh, we will have to make a disclosure soon, since they are going to take our deposition." Id.

On October 30, 2001, Pettigrew forwarded Hoberg several e-mail attachments from Heddleson. Heddleson represented that 3dfx had settled four creditors' claims as follows:

4

| Creditor | Original Claim (USD) | Settlement Amount (USD) |
|---|---:|---:|
| CIT | 701,113.98 | 692,433.00 |
| Hyundai | 1,220,000.00 | 900,000.00 |
| Network Appliance | 321,172.42 | 252,569.94 |
| Startemps | 10,154.00 | 8,500.00 |
| **Total** | **2,252,440.00** | **1,853,503.94** |

(Decl. Arnone, Ex. 28.) Pettigrew wrote to Hoberg that nVidia could rely on Heddleson's representations to give the requested release instructions to the Escrow Agent, as there remained enough money to cover Yoh, the fifth creditor. Id. 3dfx received nearly $400,000 from the Escrow Fund. See id.

**B.    Procedural History**

After the APA closed, 3dfx faced two lawsuits by its landlords, CarrAmerica Real Estate ("CarrAmerica") and Carlyle Fortran Trust ("Carlyle"). On July 18, 2002, 3dfx filed a Petition for Voluntary Winding Up and Dissolution in Santa Clara Superior Court. Following opposition by one of the landlords, the state court denied 3dfx's Petition. On October 15, 2002, 3dfx filed for bankruptcy relief, and the two lawsuits by its landlords were removed to the Bankruptcy Court. On January 23, 2003, the Bankruptcy Court appointed a Chapter 11 Trustee, who filed a lawsuit against nVidia. Like the landlord suits, the Trustee's lawsuit alleged that the APA was a fraudulent transfer and that the true transaction was a *de facto* merger between nVidia and 3dfx. (Crime-Fraud Order at 2.) The Bankruptcy Court consolidated the three actions for pretrial purposes. The landlords and Trustee entered into a Joint Litigation Agreement ("JLA"), with Carlyle taking the lead on discovery motion practice.

On May 2, 2003, Carlyle filed a Motion for Order Issuing Terminating Sanctions or Other Appropriate Sanctions ("2003 Motion") on behalf of the JLA participants, arguing that nVidia's attorney-client privilege should be pierced based on the crime-fraud exception. Carlyle relied on the April 24, 2001 e-mail from nVidia's outside counsel (Lanier) to nVidia's in-house counsel (Pettigrew) and CFO (Hoberg), quoted above, as its evidence that the crime-fraud exception applied.

5

At the hearing on Carlyle's 2003 Motion, the Bankruptcy Court stated, "...when we look at what can be shown at this point, I don't think you can establish a prima facie case of fraud [necessary for the crime-fraud exception to the attorney-client privilege to apply]. And I'm not saying you won't be able to do that six months from now. I have no idea whatsoever, but at this point I don't think you can establish a prima facie case of fraud. And therefore I don't think you can use the crime-fraud exception at this juncture to get around the privilege." (nVidia's Appendix, Ex. D at 18.)

On May 28, 2004, the Bankruptcy Court entered an order requiring: (1) written discovery complete by July 30, 2004; (2) depositions complete by August 20, 2004; and (3) expert discovery complete by October 15, 2004. (Declaration of Karen Johnson-McKewan in Support of nVidia Defendants' Opposition to Trustee's Motion to Compel Production of Documents (Crime-Fraud), Ex. P at 6, hereafter, "Decl. KJM") On July 11, 2004, counsel for Trustee and nVidia discussed whether the Trustee could obtain access to nVidia attorneys' files related to the APA pursuant to the crime-fraud exception. On July 2, 2004, the Trustee demanded nVidia's production of privileged documents in writing. (KJM Decl, Ex. Q.) On July 30, 2004, nVidia responded, rejecting the applicability of the crime-fraud exception and refusing to provide requested documents. (Decl. KJM, Ex. R.) The parties extended depositions past the August 20, 2004 cutoff to accommodate witness scheduling issues. They completed depositions on October 1, 2004 and exchanged expert reports on October 8, 2004. (Decl. KJM, Ex. V.) The action was stayed in early October 2004 for the parties to attend mediation. The parties commenced mediation on February 10, 2005. After several months of discussion proved unfruitful, the Trustee terminated the stay on July 1, 2005. (Decl. KJM, Ex. CC.)

The Trustee almost immediately filed a motion to compel thousands of privileged documents, arguing that the crime-fraud exception to the attorney-client privilege applied to three different aspects of the agreement between 3dfx and nVidia: (1) the APA, from planning and drafting to closing; (2) the creation of the Escrow Account, allegedly for the purpose of avoiding payment to 3dfx's creditors; and (3) nVidia's alleged agreement to lease 3dfx's premises. (Crime-

6

Fraud Order at 2-3.)  In June 2006, the Bankruptcy Court granted the Trustee's motion, only as to the creation of the "secret" Escrow Account.  To entertain the motion, the Bankruptcy Court found an exception to Local Rule 26-2, which ordinarily bars motions to compel discovery filed more than seven days after the discovery cutoff.  Reaching the merits, the Bankruptcy Court concluded that the crime-fraud exception to the attorney-client privilege applied to documents concerning the allegedly secret Escrow Account.  Presently before the Court is nVidia's Petition for Writ of Mandamus.

### III.  STANDARDS

When reviewing the decision of a bankruptcy court, the district court acts as an appellate court and may affirm, modify, or reverse a bankruptcy court's order, or remand the case to the bankruptcy court.  Fed. R. Bankr. P. 8013.  The bankruptcy court's conclusions of law are reviewed de novo.  In re Alcala, 918 F.2d 99, 103 (9th Cir. 1990).  In contrast, the bankruptcy court's findings of fact should not be set aside unless they are clearly erroneous.  Id.

### IV.  DISCUSSION

nVidia challenges the Crime-Fraud Order on both procedural and substantive grounds.  First, nVidia contends that the Bankruptcy Court abused its discretion in finding a good cause exception to Local Rule 26-2's bar on motions to compel filed more than seven days after the discovery cut-off. (Petition for Writ of Mandamus Regarding Order Compelling Production of Privileged Documents (Crime Fraud) at 9-12, hereafter, "Petition," Docket Item No. 1.)  Second, nVidia contends that the bankruptcy court misapplied the crime-fraud exception to the attorney-client privilege. (Petition at 12-14.)

**A.   Local Rule 26-2**

Local Rule 26-2 provides as follows:

**Discovery Cut-Off; Deadline to File Motions to Compel.**

Unless otherwise ordered, as used in any order of this Court or in these Local Rules, a "discovery cut-off" is the date by which all responses to written discovery are due and by which all depositions must be concluded.

7

> Where the Court has set a single discovery cut-off for both fact and expert discovery, no motions to compel discovery may be filed more than 7 court days after the discovery cut-off.
>
> Where the Court has set separate deadlines for fact and expert discovery, no motions to compel fact discovery may be filed more than 7 court days after the fact discovery cut-off, and no motions to compel expert discovery may be filed more than 7 court days after the expert discovery cut-off.
>
> Discovery requests that call for responses or depositions after the applicable discovery cut-off are not enforceable, except by order of the Court for good cause shown.

Within the Ninth Circuit, there exists a clear policy of allowing the district or bankruptcy court first considering the question to determine whether it is appropriate to excuse strict compliance with the local rules. The reviewing court checks only for an abuse of discretion. See, e.g. In re Loretto Winery, Ltd., 107 B.R. 707, 710 (9th Cir. BAP 1989); see also Allen v. U.S. Fidelity & Guaranty Co., 342 F.2d 951, 954 (9th Cir. 1965); In re Comer, 27 B.R. 1018, 1022-23 (9th Cir. BAP 1983), aff'd. on other grounds, 723 F.2d 737 (9th Cir. 1984); Guam Sasaki Corp. v. Diana's, Inc., 881 F.2d 713 (9th Cir. 1989).

The Bankruptcy Court found as follows:

> Based on a review of all the letters and e-mails submitted by both parties in this motion, Trustee first raised the crime-fraud exception with nVidia by letter dated July 2, 2004. The fact discovery cut-off was August 20, 2004. However, the parties agreed to continue depositions of certain fact witnesses after the discovery cut-off and did not seek a court order memorializing this agreement. Some of the evidence used by Trustee in support of this motion to compel is testimony from the post-discovery cut-off depositions. nVidia agreed to stay this litigation pending the mediation efforts shortly after the last post-discovery cut-off deposition was completed. Trustee filed this motion within six weeks of notifying nVidia that he was no longer staying this litigation. Based on nVidia's actions regarding staying the litigation pending mediation efforts, there is a viable excuse that permits Trustee to file the motion to compel after the 7 court day deadline in Civil Local Rule 26-2.

(Crime-Fraud Order at 4-5.) Here, the parties voluntarily extended discovery past the original deadlines and then sought a stay to mediate the case. Accordingly, the Court finds that the

//

8

1 Bankruptcy Court did not abuse its discretion in permitting the Trustee to file the motion to compel
2 after the seven court day deadline.[2]

### B.   Crime-Fraud Exception to the Attorney-Client Privilege

#### 1.   Attorney-Client Privilege

The Bankruptcy Court held that because the action involves claims and defenses under state law, federal common law does not govern privilege issues. (Crime-Fraud Order at 5.) Under California law, the person asserting the attorney-client privilege bears the initial burden of proving that a communication has been made in confidence during the course of the attorney-client relationship. FDIC v. Fidelity & Deposit Co. of Md., 196 F.R.D. 375, 380 (S.D. Cal. 2000). The burden then shifts to the party opposing the privilege to show that the communication was not confidential or falls within an exception. Id. The Court finds that absent a relevant exception, the sought-after documents are protected by the attorney-client privilege.

#### 2.   Crime-Fraud Exception

nVidia contends that the Bankruptcy Court erred twice with respect to the merits. First, nVidia did not misrepresent the escrow's existence, but rather remained silent; silence does not represent a prima facie case of fraud in the absence of a duty to speak. Second, the Bankruptcy Court relied exclusively on the single e-mail that the Trustee presented, failing to consider nVidia's evidence with respect to the Escrow Account. (Petition at 13.) The Bankruptcy Court's error was exacerbated by its disregard for its previous denial of Carlyle's 2003 Motion based on the same evidence. (Petition at 14.)

The Trustee contends that nVidia's conduct was not only fraudulent, but in violation of Cal. Penal Code § 531, which prohibits certain criminal conspiracies; that the Bankruptcy Court did not fail to consider evidence; and that Carlyle's 2003 Motion did not address the crime prong of the

---

[2] To conclude that the Bankruptcy Court did not abuse its discretion, the Court need not resolve the question of whether Goodridge Holding, Inc. v. Suh, 239 F. Supp. 2d 947, 966 (N.D. Cal. 2002) recognizes a "good cause excuse" to Local Rule 26-2. The Court need only recognize the generally broad discretion afforded Bankruptcy Courts to excuse compliance with the Local Rules.

1 crime-fraud exception. (Trustee's Consolidated Opposition to nVidia's Motion for Leave to Appeal
2 Order Partially Granting Trustee's Motion to Compel Production of Documents, and to nVidia's
3 Petition for Writ of Mandamus at 16-18, hereafter, "Opposition.")

4 Under California law, there is no attorney-client privilege "if the services of the lawyer were
5 sought to enable or aid anyone to commit or plan to commit a crime or fraud." Cal. Evid. Code §
6 956. This crime-fraud exception to the attorney-client privilege is "very limited," and its proponent
7 must make two showings. Geilim v. Sup. Ct., 234 Cal. App. 3d 166, 174 (1991). First, it must
8 establish a prima facie case of crime or fraud. Cunningham v. Connecticut Mut. Life Ins., 845 F.
9 Supp. 1403, 1412 (S.D. Cal. 1994) (citing BP Alaska Exploration, Inc. v. Sup. Ct., 199 Cal. App. 3d
10 1240, 1262 (1988); Nowell v. Sup. Ct., 223 Cal. App. 2d 652, 657 (1963)). Second, it must establish
11 a reasonable relationship between the crime or fraud and the attorney-client communication. BP
12 Alaska, 199 Cal. App. 3d at 1268. The crime-fraud exception allows discovery only of documents
13 reasonably related to the fraud. Cunningham, 845 F. Supp. at 1415.

14 The Bankruptcy Court found that the only aspect of the Escrow Account that fell within the
15 crime-fraud exception was "nVidia's conspiracy with 3dfx to keep the knowledge of that account
16 from the writ creditors that the escrow account benefitted." (Crime-Fraud Order at 7.) This finding
17 was explicitly based on a single piece of evidence—Lanier's e-mail stating:

18 I recognize that nVIDIA is trying to assist 3dfx's negotiations with these creditors by not revealing the existence of the escrow. I plan to buy a bit more time by
19 responding to creditors in writing late today, simply explaining that the levied party, nVIDIA Corporation, did not make any payment to 3dfx on April 19, nor should
20 creditors have thought it would, based on the publicly disclosed documents concerning the transaction. I do think it will appear a bit odd to the court(s) if we
21 reveal the existence of the escrow for the first time in court papers (or orally) in response to enforcement proceedings. Nonetheless, given previous instructions, we
22 won't mention the escrow until then or until you allow us to do so.

23 (nVidia's Appendix Ex. A, at 18.) The Court reviews *de novo* the Bankruptcy Court's determination
24 of the applicability of the crime-fraud exception.
25 //
26
27
28

10

### i. Fraud

To establish a prima facie case of fraud, the proponent of the exception must prove (1) a false representation of a material fact; (2) knowledge of its falsity; (3) intent to deceive; and (4) the right to rely on the representation. BP Alaska, 199 Cal. App. 3d at 1263. Further, "where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is *some relationship* between the parties which gives rise to a duty to disclose such known facts." See, e.g., LiMandri v. Judkins, 52 Cal. App. 4th 326, 336-37 (1997) (emphasis in original).

The available evidence establishes that nVidia engaged in a transaction with a legitimate business purpose. Following the execution of the APA, five of 3dfx's creditors obtained writs of attachment or temporary protective orders (collectively, "writs") against 3dfx and its assets. The writs prevented 3dfx from satisfying all of the closing conditions specified in the APA. In order to take 3dfx's assets free and clear, nVidia placed $2.6 million of the APA purchase price, the amount implicated by the five writs, into an escrow for 3dfx's use in settling with its creditors.[3] (Decl. Arnone, Ex. 27.) Logically, it would have been of no consequence to nVidia whether 3dfx (1) used the $2.6 million to satisfy the five writ creditors or (2) settled with the five writ creditors for less than $2.6 million, and used the remainder of the escrow money to settle with its other (non-writ) creditors. There is no evidence that nVidia had a relationship with 3dfx's five writ creditors so as to give rise to a duty to disclose the existence of the Escrow Account to them. nVidia's silence in the absence of a duty to disclose did not constitute a false representation of a material fact. This is true even if, as the Trustee contends, nVidia remained silent to assist 3dfx in settling its claims with the writ creditors for less than 100 cents on the dollar. Since the Trustee has not satisfied the first element of his prima facie fraud case, it is not presently appropriate for the Court to pierce the attorney-client privilege on the basis of fraud.

---

[3] nVidia has, in fact, presented evidence to support its contentions (1) that the Escrow Account existed to facilitate payment to creditors rather than to defraud them and (2) that nVidia believed that the APA's $70 million payment would be sufficient to satisfy 3dfx's creditors. (See Appendix, Ex. F.)

11

However, the Court notes the April 24, 2001 statement of nVidia's outside counsel, "I plan to buy a bit more time by responding to creditors in writing late today, simply explaining that the levied party, nVIDIA Corporation, did not make any payment to 3dfx on April **19**, nor should creditors have thought it would, based on the publicly disclosed documents concerning the transaction" (emphasis added). In reality, nVidia did make a $2.6 million payment into the Escrow Account for 3dfx's benefit on April **18**, 2001. Based on counsel's e-mail, there is a possibility that nVidia, through counsel or otherwise, deliberately and materially misrepresented the fact of the Escrow Account's existence to 3dfx's creditors. There is presently no evidence before the Court whether (1) nVidia's counsel did respond to creditors' inquiries, whether orally or in writing and (2) whether any response made contained a material misrepresentation.

Accordingly, the Court finds that it is appropriate to reopen discovery for this limited purpose: To the extend necessary for the Trustee to determine what statements and representations, if any, nVidia or its counsel made to 3dfx's creditors between April and October 2001.

### ii. Crime

California Penal Code § 531 provides:

> Every person who is a party to any fraudulent conveyance of any lands, tenements, or hereditaments, goods or chattels, or any right or interest issuing out of the same, or to any bond, suit, judgment, or execution, contract or conveyance, **had, made, or contrived with intent to deceive and defraud others, or to defeat, hinder, or delay creditors or others of their just debts, damages, or demands**; or who, being a party as aforesaid, at any time wittingly and willingly puts in, uses, avows, maintains, justifies, or defends the same, or any of them, as true, and done, had, or made in good faith, or upon good consideration, or aliens, assigns, or sells any of the lands, tenements, hereditaments, goods, chattels, or other things before mentioned, to him or them conveyed as aforesaid, or any part thereof, is guilty of a misdemeanor.[4]

(emphasis added). As explained above, there is no evidence that the Escrow Agreement was a fraudulent conveyance *either* (1) contrived with intent to deceive and defraud others or (2) to defeat,

---

[4] There is little state-law guidance on how to apply this provision in this context. The majority of cases before the California Supreme Court implicating Cal. Penal Code § 531 have been in the unrelated context of attorneys seeking judicial review of disciplinary sanctions imposed by the California Bar for defrauding creditors. See, e.g., Coppock v. State Bar, 44 Cal.3d 665 (1988); Allen v. State Bar, 20 Cal. 3d 172 (1977).

**United States District Court**
For the Northern District of California

hinder, and delay creditors. To the contrary, presently available evidence suggests that the escrow was created to facilitate payment of creditors.[5] In particular, the Trustee cannot make a prima facie showing of a crime in the absence of evidence that nVidia acted with an unlawful intent. It is consequently not appropriate for the Court to pierce the attorney-client privilege on the basis of crime. The Court finds that the Bankruptcy Court erred in finding the crime-fraud exception applicable to this case.

## V. CONCLUSION

The Court GRANTS nVidia's Petition for Writ of Mandamus. The Bankruptcy Court is directed to vacate its June 7, 2006 Crime-Fraud Order. Discovery is reopened to the limited extent necessary for the Trustee to determine what statements and representations, if any, nVidia or its counsel made to 3dfx's creditors between April and October 2001. The matter is remanded to the Bankruptcy Court for a determination consistent with this Order. The Bankruptcy Court shall set the appropriate discovery schedule, and upon the close of discovery, determine whether nVidia made positive misrepresentations rendering relevant the crime-fraud exception to the attorney-client privilege.

The Clerk shall close this miscellaneous action.

Dated: December 15, 2006

JAMES WARE
United States District Judge

---

[5] Under § 531, a crime is committed upon interference with a "just debt," a phrase as yet not construed by the California courts. The evidence before the Court suggests that the writ creditors had prejudgment attachments, meaning that the debts were still subject to litigation. The Court finds that a dispositive difference exists, for § 531 purposes, between negotiations to pay creditors less than 100 cents on the dollar on (1) debts still subject to litigation versus (2) debts that have been reduced to final judgment.

13

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Richard C. Darwin, rdarwin@buchalter.com
James N. Kramer, jkramer@orrick.com
Justin Myer Lichterman, jlichterman@orrick.com
Karen Johnson-McKewan, kjohnson-mckewan@orrick.com

United States Bankruptcy Court
280 South First Street, 3rd Floor
San Jose, CA 95113

**Dated: December 15, 2006**          **Richard W. Wieking, Clerk**

                                             **By:   /s/ JW Chambers**
                                               **Elizabeth C. Garcia**
                                               **Courtroom Deputy**